# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KELLY S. IVEY,**

      **Plaintiff,**

**v.**                         **Case No. 5:12cv243/RS/CJK**

**CAROLYN W. COLVIN[1]**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") under Title XVI, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence

---

[1] Carolyn W. Colvin succeeded Michael J. Astrue as Commissioner of Social Security and is automatically substituted as the defendant. FED. R. CIV. P. 25(d).

and that the matter should be remanded for further proceedings and a determination consistent with the findings set forth herein.

## PROCEDURAL HISTORY

The claimant filed applications for disability benefits and SSI on July 19, 2008, alleging disability beginning on June 13, 2008. T.14, 88-97, 93, 167-76.[2] Her applications initially were denied, and the denial was upheld on reconsideration. T. 14, 88-91, 93-97, 104-09. Claimant filed a request for a hearing. T. 13, 110. Her request was granted, and a hearing was conducted on December 1, 2010. T. 13, 110. On January 3, 2011, the administrative law judge ("ALJ") found that the claimant was not disabled as defined by the Act. T.14-23. The claimant requested review by the Appeals Council, which denied her request on April 18, 2012. T. 5-9. 157, 280-81. Claimant thus instituted this action, challenging the Appeals Council's decision in that regard.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

1. Claimant met the insured status requirements of the Social Security Act through December 31, 2012.

2. Claimant has not engaged in substantial gainful activity since June 13, 2008, the alleged onset date.

---

[2] The administrative record, as filed by the Commissioner, consists of eight volumes (doc. 9-2 through 9-9), and has 546 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

3. Claimant has the following severe impairments: degenerative disc disease with disc herniation and migraine headaches.

4. Claimant's impairments do not meet the listed impairments in sections 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Claimant has the residual functional capacity (RFC) to perform sedentary work, except she can only push and pull occasionally with her arms and can only occasionally stoop, kneel, crouch and crawl.

6. Claimant can perform her past relevant work as a loan counselor and, therefore, is not disabled under the Social Security Act.

T. 16-22.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). When reviewing the legal principles upon which the Commissioner's decision is based, the court conducts a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). When reviewing the resulting decision, however, the court determines only whether it is supported by substantial evidence. *See id.* Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With

reference to other standards of review, the Eleventh Circuit has explained that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439). Thus, although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, however, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Hence, while review is deferential to a point, the reviewing court conducts what has been referred to as "an independent review of the record."[3] *See Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10cv725-FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09cv2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision as to whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, but also "cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy

that accommodates her residual functional capacity ("RFC") and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Eleventh Circuit has explained the operation of step five as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that [s]he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Step five (or step four in cases such as the present one in which the ALJ decides a claimant can perform her past work) is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used

by the ALJ to make the ultimate vocational determination required by step five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4] 20 CFR § 404.1545(1). Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by a disappointed claimant. Here, claimant raises the following issues relating to RFC: 1) the ALJ erred in rejecting the treating

---

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

physician's opinions;[5] and 2) the ALJ erred in finding the plaintiff not credible. Doc. 16, p. 6.

FACT BACKGROUND AND MEDICAL HISTORY[6]

On August 27, 2007, plaintiff first saw neurologist, internist, and pain medicine specialist Mustafa Hammad, M.D., for migraine headaches. At that time, she reported a history of back pain and progressively worsening headaches occurring one to three times a week, lasting hours and days at times, with throbbing pain, photo- and phonophobia, and nausea. T. 540-41. Dr. Hammad believed the complaints were most consistent with migraine headaches. He prescribed prophylactic treatment with Topamax because the headaches were occurring more frequently and "interfering with her daily life." T. 542. Plaintiff also was instructed to continue with Maxalt as needed for abortive therapy (acute treatment of migraine). R. 542. On September 10, 2007, plaintiff informed Dr. Hammad that her headaches had worsened and that she was taking only the Maxalt because she could not afford the copayment on Topamax. She also indicated that Lortab was providing some pain relief. Dr. Hammad continued her medications and provided her with a prescription assistance card. T539-40.

Gulf Imaging Open MRI performed cervical and lumbar spine MRIs on claimant on January 9, 2008. The cervical spine MRI revealed "multilevel pathology

---

[5] As explained in more detail below, although the plaintiff states that the ALJ failed to sufficiently credit two of her treating physician's opinions, she actually argues that the ALJ failed to credit one opinion and gave undue credit to the other.

[6] The recitation of medical and historical facts of this case, as set out below, is based upon the court's independent review of the record. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

with acquired spinal stenosis, as well as nerve root compromise." T. 291.    In particular, the MRI showed: 1) a right disc bulge at C4-5 with extension of disc material into the left neural foramen, causing left-sided foramina compromise; 2) a disc bulge with significant extension of disc material into both neural foramina with foraminal narrowing, which was complicated by bilateral hypertrophic osteoarthritis of the synovial articulating facet joints; and 3) a left disc herniation at C6-7 leading to acquired spinal stenosis with extension of disc material into the left neural foramen, also complicated by bilateral hypertrophic osteoarthritis of the synovial articulating facet joints, with "almost certain compromise of the left C7 nerve root." T. 290-91.  The lumbar spine MRI revealed a circumferential disc bulge with midline annular tear at L4-5, as well as mild multilevel hypertrophic osteoarthritis of the synovia articulating facet joints.  T. 289.

Claimant followed up with Dr. Hammad in February 2008, at which time she reported using the Maxalt for acute migraine relief more than twice a week.  T. 345. She also complained of neck pain.  Upon examination, Dr. Hammad noted moderate tenderness over the greater and lesser occipital notches bilaterally.  Dr. Hammad's impression was occipital neuralgia, common migraine, cervicalgia, cervical degenerative disc disease, lower back pain/lumbago, lumbosacral degenerative disc disease, and thyroid nodule.  An occipital nerve block procedure was prescribed for the claimant's headaches, in addition to Inderal as a preventative measure, if tolerated.  T. 346.  Dr. Hammad next saw claimant on February 19, 2008, after the plaintiff had endured a week of "severe excruciating neck pain."  Despite treatment

with Percocet and Robaxin[7], as well as a shot at an urgent care visit, claimant continued to have significant pain and muscle spasm. T. 349. Upon examination, Dr. Hammad noted severe tenderness and muscle spasm and tightness in the cervical paraspinal muscles. T. 350). He administered the claimant thirteen trigger point injections and continued her prescriptions for Percocet and Inderal. T. 348, 350.

On March 3, 2008, plaintiff saw Dr. Hammad for a severe migraine headache of several days duration. She reported throbbing pain associated with photo- and phonophobia. Dr. Hammad noted plaintiff was crying while in the office due to pain. A Toradol injection was provided for a migraine abortive; an occipital nerve block procedure also was prescribed. In addition, Dr. Hammad prescribed Depakote 500 mg, to be titred up to 1000 mg daily, because the Inderal was not working as a migraine preventative. Dr. Hammad also prescribed Toradol[8] and Phenergan. T. 351-52. On March 4, and again on March 11, 2008, Dr. Hammad administered the claimant greater and lesser occipital nerve blocks for the ongoing headaches. T. 353-54T.

On April 2, 2008, plaintiff returned to see Dr. Hammad after cancelling the third in the series of occipital nerve blocks. She reported no significant improvement in her headaches and that she continued to have neck pain radiating into her head and

---

[7]The claimant was prescribed Percocet and Robaxin by her primary care physician, Dr. Malik, when Dr. Hammad was out of town. She was concerned that, in receiving prescriptions from Dr. Malik, she might have violated her pain management contract with Dr. Hammad. Dr. Hammad assured her, however, that no such violation had occurred and that "it was fine with us. . ." T. 349.

[8]Although Dr. Hammad's "Plan" indicates Toradol, a non-asteroidal anti-inflammatory, for abortive therapy, the "Prescriptions" note indicates Maxalt to be used at the outset of the headache. T. 352.

numbness and tingling in her left upper extremity. T. 355. Dr. Hammad diagnosed plaintiff with migraine (intractable), tension headache, cervicalgia, cervical spinal stenosis, cervical degenerative disc disease, and occipital neuralgia. He believed that plaintiff's severe cervical stenosis was "most likely contributing to her joint pain and her headaches" and recommended facet joint injections and radio frequency nerve lesioning procedures. He prescribed the claimant Flexeril, Maxalt, and Phenergan. T. 356. On April 16, 2008, Dr. Hammad administered cervical facet injections at C4 through C7 bilaterally due to plaintiff's lack of improvement with conservative measures. T. 357. By April 25, 2008, claimant reported tremendous improvement in pain after the facet injections. T. 358. Dr. Hammad continued to diagnose intractable migraine, along with the other conditions, and ordered a second and third round of facet injections. T. 359. Also on April 25, Dr. Hammad completed a Family and Medical Leave Act ("FMLA") form, noting that plaintiff had migraine, neck pain, and cervical spinal stenosis, which made it necessary for her to work "only intermittently or on a less than full schedule," depending on her pain. T. 543. He further noted that the plaintiff's treatments and number of absences would depend on her headaches and that her continuing treatment included facet injections, Depakote, and Flexeril. T. 544.

The next series of facet injections occurred on April 30, 2008, with treatment of the cervical spine from C4 through C7. T. 361. After the injections, the plaintiff reported numbness and tingling in her left leg and arm. Dr. Hammad was concerned that the claimant might have had a cerebral vascular accident (stroke), so he cancelled further injections pending evaluation. A May 15, 2008, brain MRI was deemed normal( T. 283); Dr. Hammad thus planned to resume the facet joint injection series

in two weeks. The injections were moved up by a week, however, due to plaintiff's significant symptoms. Dr. Hammad continued the Depakote and Flexeril for headaches and prescribed plaintiff Lortab, with warnings of sedation, for pain. T. 365-67. On June 11, 2008, plaintiff received the third in the series of facet injections bilaterally at C4 through C7. T. 368.

On June 23, 2008, Ms. Ivey reported some relief after the facet injections but continuing severe neck pain and headaches. Upon examination, Dr. Hammad noted moderate tenderness over the cervical paraspinal muscles and some significant tenderness over the greater and lesser occipital notches bilaterally. Based upon the MRI report, Dr. Hammad charted significant findings of spinal stenosis and herniated disc. T. 374. He discussed surgery with the claimant, who expressed her hesitancy and preference for epidural injections in the cervical spine. T. 374. Claimant also reported that her new medication, Zanaflex, prescribed three times a day, caused her to experience some sedation. T. 374. She was instructed not to drive while using Zanaflex.

On July 3, 2008, plaintiff reported some improvement in her symptoms with Zanaflex, although the Flexeril was more helpful; she also noted that the Lidoderm patches were not effective. Plaintiff was unable to fill the Lyrica prescription because insurance provider would not approve it. She was still taking Lortab and still considering the options of surgery and injections. By this time, Ms. Ivey was out of work and on temporary disability. T. 376. Upon examination, Dr. Hammad noted moderate tenderness of the cervical paraspinal muscles. Flexeril was reinstated, and Neurontin was substituted for Lyrica. Dr. Hammad noted that he would "keep the patient out of work for now." T. 377. On August 1 and 29, 2008, plaintiff reported

better control of headaches and pain, but difficulty lifting her arms and walking in the mornings; she indicated a desire to further discuss epidural injections. T. 379, 381, 415. Again, Dr. Hammad charted intractable migraine and degenerative disc disease and stenosis of the cervical spine. T. 377. Dr. Hammad kept claimant out of work. T. 377.

In September 2008, Dr. Hammad charted pain radiating into claimant's arms and low back pain radiating into her legs. T. 384. He continued the plaintiff on pain medications and wanted to increase the Neurontin but noted that the plaintiff had difficulty tolerating the full dosage. T. 384. On September 23, plaintiff underwent a cervical steroid epidural injection. T. 386. Because of continued pain, she was referred to Dr. Rohan for surgical consultation. T. 388-390. Also in September, Dr. Hammad completed a check-off style "attending physician" form for purposes of plaintiff's claim for disability insurance. T. 474-475. He marked boxes indicating that, over the course of an eight-hour day, with two breaks and lunch, the plaintiff could alternately stand, sit, walk, and drive for one to three hours. He also indicated that the plaintiff could lift or carry ten pounds maximum and occasionally carry small objects, which, according to the form, was associated with sedentary work.[9] Dr. Hammad filled in a blank as to diagnosis consistent with his office notes. T. 474.

In December, claimant continued to report worsening headaches with light sensitivity and nausea, despite using Neurontin. T. 391-392. Due to significant pain, Dr. Hammad scheduled another epidural for January 2009. T. 392. As on previous visits, Dr. Hammad counseled Ms. Ivey concerning the side effects of her medication,

---

[9] The box Dr. Hammad checked indicating the plaintiff's ability to lift and carry objects was the most restrictive one on the form.

including sedation, dizziness, and lightheadedness. T. 392. He administered epidural injections, including cervical and lumbar, on February 3, 10, and 17. T. 397, 399, 401.

After continued complaints of neck and arm pain, plaintiff underwent a cervical dorsal median branch block in July. T. 523. She reported cervical pain relief through September. T. 520. The headaches, however, had increased and she suffered a broken rib in a fall. T. 519. By November, claimant reported "fair relief" with the pain medications, but continued neck pain; she also indicated that she was "falling asleep at inappropriate times." T. 514. In December, the neck pain was significant despite continued use of prescribed pain medications. T. 511. A cervical MRI performed on December 31, 2009, revealed central disc herniation at L4-5, more pronounced than on a previous study. T. 481. The MRI also showed right foramina narrowing due to facet disease at L3-4 with nerve root impingement. T. 481.

Because of financial issues, the plaintiff did not return to Dr. Hammad until March 12, 2010, at which time she had "awful" pain in her neck, continuing headaches with nausea, and continuing back pain. T. 504. The claimant had run out of her medications and was unable to purchase more. She also was financially unable to obtain nerve conduction studies and pain control procedures. T. 506. She returned to Dr. Hammad on March 22 with a severe headache of several days duration, not relieved by pain medication. T. 503. Dr. Hammad's office administered Toradol, IM for headache relief. T. 503. Still reporting pain in April, plaintiff was advised that she needed a surgical evaluation, which she apparently was unable to afford. T. 499-500.

On July 14, 2010, plaintiff saw Dr. Ahmad of the Neuropain Clinic. T. 488-490. She reported severe tenderness of the left paraspinal muscles and that she was having difficulty with her family due to her limited ability to perform household duties. T. 488. Claimant had a regular follow-up at Neuropain Clinic on August 11, 2010. She indicated at that time that she had suffered an acute illness, but that it had resolved. T. 485. Diagnoses as of that date included lower back pain, muscle spasms, lumbosacral radiculopathy, lumbar stenosis, cervical stenosis, cervical degenerative disc disease, occipital neuralgia, migraine headaches, and tension headaches. T. 486.

Earlier, on July 17, 2010, claimant underwent a brain CT scan at Bay Medical Center. This study revealed a "tiny hypodensity. . .at the gray/white junction in the left frontal lobe." This finding was "non-specific" but "consistent with findings seen in migraine." T. 482.

## HEARING BEFORE THE ALJ

Ms. Ivey testified on her own behalf at the ALJ hearing conducted on December 1, 2010. T. 35-80. The substance of that testimony is important to the reviewing court because the ALJ found her statements "not credible" in large part. T. 19-20.

Claimant lives with her husband and fourteen year old son. She has a car and drives her son to school. T. 39. Claimant described her last job as a student loan analyst with Sallie Mae, a position she held until June 2008, when Dr. Hammad took her off work.[10] T. 42. While employed by Sallie Mae, the claimant sat at a desk, with

---

[10] Ms. Ivey reported that, by the time Dr. Hammad took her off work, she already had "miss[ed] a lot of work." T. 43.

a computer, and compiled financial information for loan applications. Although she tried to work at housecleaning after she left Sallie Mae, she found that she "lasted an hour maybe." T. 50. Ms. Ivey currently receives long-term disability benefits from an insurance company. T. 50.

Plaintiff finds she can do some things around the house. She can shower and wash her hair. She can cook just about anything, although she cannot stand for very long. T. 52. She can clean counters, but she cannot bend over to clean the bathtub. T. 54. She can move clothes from the washer to the dryer, depending on her neck pain. T. 58-59. She also gets her son ready for school, and she tries to attend his baseball games when she can. Claimant tries to sleep after taking her son to school, but suffers with "morning headaches." The longer she stays in bed, the worse her neck and back hurt. T. 59. At the time of the hearing, Ms. Ivey was taking Lortab, Panax, Fioricet, Flexoril, and Ambien on an as-needed basis. T. 61-62. The Lortab makes her feel sick and the others make her sleepy.

The ALJ noted that Dr. Hammad had recommended that the claimant see an orthopedic surgeon. T. 65. Claimant admitted this, but reported that she was "scared." T. 66. The ALJ found such fear "understandable." T. 66. The surgical treatment she considered includes the cervical (neck) and lumbar (low back) spine.

On examination by her lawyer, Ms. Ivey reported that the migraines prevented her from sitting at a computer. While at Sallie Mae, she felt that the neck pain when sitting would bring on the migraines. T. 68. She found that she was missing work three to four days a week; she nevertheless tried to work with the pain for six or seven months. T. 69. Her employer allowed her to keep her job under the provisions of the FMLA. T. 69.

Claimant described the pain she experiences. According to the claimant, the cervical nerve pain is "like a knife stabbing me in the back." T. 72. Pain goes up her neck and down her arm, sometimes numbing her right arm. T. 72. When that happens, the claimant cannot do much lifting, her elbow gives out, and writing becomes difficult. T. 72. She can sit at a computer for no more than thirty minutes at a time. She would "love to" work at a part-time job, but she cannot do the required standing and bending. T. 76. As to the migraines, the claimant is unable to predict their onset. Once one begins, she becomes sick to her stomach. The severe migraines occur at least every other day, but she experiences a headache every day. T. 77. When she has a severe attack, she goes in a dark room and puts pillows over her head. In reference to her former job at Sallie Mae, claimant did not believe she could work an eight hour day or be a reliable employee. T. 78.

Robert Strader appeared at the hearing as a vocational expert. In response to a question from the ALJ setting out the RFC to perform light work, Mr. Strader believed plaintiff could perform her past work. T. 80-81. With additional restrictions, including standing or walking only two hours a day and sitting only six hours a day, Mr. Strader maintained his position that the claimant could perform her past work at Sallie Mae. T. 81. Asked another question assuming an RFC of sedentary work, Mr. Strader identified a number of jobs the claimant could perform. T. 82. In response to the ALJ's final question, which assumed a claimant who could not work at any exertional level, Mr. Strader said no jobs would be available. T. 82-83.

On cross-examination by plaintiff's lawyer, Mr. Strader said that a normal employer would tolerate absenteeism of one or maybe two days a month. T. 84.

According to Mr. Strader, more than two absences a month would render a person unemployable. T. 84. Mr. Strader was "amazed" that claimant kept her job at Sallie Mae as long as she did in light of her absences. T. 84.

## ANALYSIS

Plaintiff urges that the ALJ erred by according "some weight" to Dr. Hammad's September 12, 2008, opinion and "little weight" to Dr. Hammad's April 25, 2008, opinion. In particular, she argues that the ALJ failed to properly credit Dr. Hammad's opinions that she was unable to sustain work without significant absences. She also questions the ALJ's decision to afford "limited" weight to the opinion of Dr. Louis, a state agency non-examining physician.

Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases). If a treating physician's opinion as to the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ is to give it controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight

as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).

As set forth above, on the September 12, 2008, disability form, Dr. Hammad indicated that the plaintiff could lift up to ten pounds and occasionally carry small objects. According to the form, such restrictions were consistent with an RFC of sedentary work. After making passing reference to Dr. Hammad's two and a half years of treatment, T. 16-17, the ALJ somewhat cryptically noted that he would give "some weight" to Dr. Hammad's September 12 opinion as the "opinion of a treating physician based upon a longitudinal history of observing and treating the claimant." T. 21. The ALJ also mentioned the FMLA form Dr. Hammad completed on April 25, 2008, in which Dr. Hammad indicated that the claimant was incapable of work while experiencing extreme pain. Dr. Hammad noted that the plaintiff suffered from migraine headaches, neck pain, and cervical spinal stenosis, all of which rendered her able to work "only intermittently or . . . on less than full schedule," depending on her pain. T. 543. Dr. Hammad further indicated that the plaintiff would be absent from work on an intermittent or part-time basis because of treatment and that the extent of her absences depended on her headaches. The ALJ gave Dr. Hammad's April 25 opinion "little weight" because Dr. Hammad did not specify "how often [he] expected the claimant's pain to be so extreme" and because he considered the September opinion to "more accurately represent[ ] the claimant's current state." T. 21.

The court finds that the ALJ erred in crediting the findings set forth in the September 12, 2008, form to the exclusion of Dr. Hammad's other opinions, including those set forth in the April 25, 2008, form, all of which are supported by Dr.

Hammad's clinical evaluations and diagnoses of the plaintiff and are consistent with other substantial evidence in the record.  Notably, in completing the September 12, 2008, form, Dr. Hammad simply checked the box with the greatest restrictions. Although that box indicated an ability to perform sedentary work, Dr. Hammad did not opine that the plaintiff was capable of performing *full-time* sedentary work, as the ALJ seems to suggest.  Even if he had, such an opinion would have been conclusory, at best, and inconsistent with Dr. Hammad's other observations and opinions, as well as the objective medical evidence, all of which substantiates the plaintiff's almost constant pain and inability to maintain regular, full-time employment.  Indeed, throughout his records, Dr. Hammad consistently noted the frequency and severity of the plaintiff's pain and instructed her to refrain from work at least twice. Moreover, the vocational expert was "amazed" that the plaintiff maintained her employment at Sallie Mae as long as she did given her absences, the necessity of which are not disputed, and testified that most employers will tolerate only a day or two of absences per month.  The ALJ thus should have afforded little weight to the opinions set forth in the September 12, 2008, form to the extent they contradicted Dr. Hammad's actual findings that the plaintiff's cervical pain and migraine headaches rendered  her unable to work for significant periods of time.

The opposite is true with regard to the April 25, 2008, form.  The ALJ largely discounted Dr. Hammad's opinion that the plaintiff was incapable of full-time work because Dr. Hammad failed to indicate how often he expected the plaintiff to be in extreme pain.  There is no indication in the record, however, that the frequency and severity of the plaintiff's symptoms were capable of precise estimation.  Moreover, it was clear from Dr. Hammad's comments that he anticipated the plaintiff's

symptoms to occur intermittently; and, again, the evidence suggests that the plaintiff was in almost constant pain and suffered debilitating migraine headaches on a weekly, if not daily, basis. In addition, considering the nature and extent of the treatment she already had endured, there was no reason to believe the plaintiff's condition would change in the foreseeable future. The court thus finds that the ALJ did not have good cause to reject Dr. Hammad's April 25, 2008, opinion, which is well-supported by Dr. Hammad's prior and subsequent observations and diagnoses of the plaintiff, as well as the other substantial evidence in the record.

Plaintiff next takes issue with the ALJ's credibility determination. Pain, as experienced by the claimant from her headaches and spinal conditions, forms the basis of the claimant's position that her inability to attend work renders her unemployable at any level.[11] Here, the ALJ found that the plaintiffs allegations of pain and other symptoms (*e. g.*, headaches, pain, nausea, lightheadedness, and sedation) were "not credible to the extent they are inconsistent with the (sedentary) residual functional capacity." T. 19-20. If the complaints of pain are credible, then pursuant to the testimony of the vocational expert, Ms. Ivey would be unemployable.

Pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides, in part, that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."

---

[11] The context of the claimant's argument concerning the credibility finding makes clear that the plaintiff's pain is the key factor in her alleged inability to maintain work. Doc. 61, pp. 20-23.

*Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the *Hand*[12] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *Adamo v. Comm'r of Social Sec.,* 365 Fed. Appx. 209 (11th Cir. 2010); *Elam v. R.R. Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991). The Eleventh Circuit also has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that [the Eleventh Circuit] interpreted when initially establishing its three-part standard." *Wilson*, 284 F.3d at 1226. Thus, failure to cite to the Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

Notably, "while both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. Indeed, the Eleventh Circuit has recognized that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir.

---

[12] *See Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005). However, a reviewing court may consider the presence or absence of evidence to support symptoms of the severity of pain claimed. *Marbury*, 957 at 839-840; *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit the plaintiff's subjective testimony concerning pain, he must do so explicitly and give reasons for his decision in that regard. *MacGregor v. Bowen*, 786 F.2d at 1054. Where he fails to do so, the testimony is to be accepted as true as a matter of law. *Holt*, 921 F.2d at 1223; *MacGregor*, 786 F.2d at 1054.[13] Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection, which is insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a

---

[13] In *MacGregor*, the court advised that:

If the Secretary refuses to credit such testimony he must do so explicitly and give reasons for that decision. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir.1982). Where he fails to do so we hold as a matter of law that he has accepted that testimony as true.

786 F. 2d at 1054. Relying upon the earlier case of *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir.1982), however, courts in the Eleventh Circuit are now generally opting for remand in cases of inadequate credibility determinations (as well as cases involving rejection of treating physician opinion). *See, e.g., Lawton v. Comm'r*,431 Fed. Appx. 830, 835 (11th Cir. 2011); *see also Albery v. Comm'r*, No. 6:11cv437-Orl-19GJK, 2012 WL 2589297, at *10 (M. D. Fla. June 7, 2012) ("The Eleventh Circuit has recently receded from [the *MacGregor*] language.").

whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's subjective complaints of pain. *See Shallow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (noting that "the ascertainment of the existence of an actual disability depended on [the ALJ's determination of] the truth and reliability of [the claimant's] complaints of subjective pain").[14] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily and effectively treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] alleges] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a

---

[14] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Here, the medical chart is replete with ongoing and consistent complaints of pain. The diagnostic studies, discussed above, provide a significant objective basis for the complaints of pain in the neck, low back, arms, and legs. The migraine headache condition is well-documented in the chart, and the records of Dr. Hammad very strongly suggest that the migraines, in frequency and intensity, have not been effectively stymied by the assortment of medications administered to the plaintiff.[15] Nevertheless, the ALJ did not find plaintiff's complaints credible. Instead, the ALJ believed that plaintiff's allegations regarding the severity of her symptoms were not consistent with her statements to doctors or with her actions. The ALJ went on to cite the medical evidence that he believed would support the rejection of plaintiff's credibility. The recitation is brief:

> The claimant reported her headaches were caused by the high stress nature of her job. In November 2009, the claimant reported fair relief with Fioricet. Also, the claimant has alleged disabling pain and numbness caused by her degenerative disc disease. However, the claimant has refused to go to a surgical consultation as suggested by Dr. Hammad. Further, the claimant has a normal gait and ambulates without assistance.

T. 20.

---

[15] Prefacing the credibility analysis, the ALJ said, "The objective medical evidence presented for review supports finding the claimant has degenerative disc disease and migraine headaches." T. 20.

With all due respect, the quoted language represents a highly selective view of an extensive medical chart.[16]  Ms. Ivey has several years of history of migraine headaches.  She continued in treatment for more than two years after her last employment date in June 2008.  One would struggle to rationalize that two years of this condition are related to the stress of a job long in the past.  Moreover, Dr. Hammad, the treating physician, did not offer such an explanation for this chronic condition.  The ALJ apparently based his finding on the report of an agency consultant, psychologist George Horvat.  T. 307-309.  Dr. Horvat reported claimant's statement that she had constant migraines because of her "highly stressful job."  T. 308.  Ms. Ivey had left Sallie Mae several months before the Horvat consult.  Moreover, Dr. Horvat is not a medical doctor and offered no authoritative opinion regarding the headaches, instead finding no psychological reasons the claimant could not work.  T. 310.

The ALJ also found significant a single report of pain relief in November 2009.  As suggested by the medical summary above, claimant saw Dr. Hammad many times.  At each visit, Dr. Hammad diagnosed migraine, often adding the descriptive term

---

[16]Although not mentioned by the ALJ as a reason for the credibility finding, the order does reflect that, as part of the analysis of severe impairments, the ALJ noted, "[C]laimant generally experiences alternating periods of being nearly pain free and being in extreme pain."  T. 16.  Such is not an accurate representation of Dr. Hammad's chart.  One of plaintiff's brief improvements of pain was noted on April 25, 2008 ("tremendous improvement" in neck pain after facet injections).  T. 358.  This period of reduced pain was before plaintiff's alleged onset date and does not undermine her allegations of disabling pain during the relevant period of time.  Also, and unmentioned by the ALJ, although the neck pain improved after facet injections in April 2008, on the same date of that report, the chart bears out continuing migraines to the extent that Dr. Hammad completed a form (discussed in the analysis of plaintiff's first point, *supra*) indicating plaintiff would have significant absences due to the headaches.  T. 543-544.

"intractable."[17]  Moreover, the relief plaintiff actually reported in November was "fair relief."  To this she added that she found herself falling asleep at inappropriate times–a side effect of the narcotic strength medications, including Fioricet.

The ALJ next mentioned plaintiff's hesitancy to seek surgical intervention. Plaintiff explained that she did not pursue surgery because she was "scared." Despite the harsh judgment of noncompliance in the decision, the ALJ stated during the hearing that the plaintiff's reluctance to undergo surgery was "understandable."  The surgery here would involve two or more levels of the spine, and the record contains no assurance that pain relief would follow.   Also unmentioned by the ALJ, claimant now has no insurance to cover these procedures.  Likewise given little heed by the ALJ, plaintiff has undergone many invasive procedures for pain control.  She had thirteen trigger point injections (T. 348, 350), a series of two occipital nerve blocks (T. 353-354), a series of three cervical facet injections (T. 357, 361, 368), five separate steroid injections (T. 386, 397, 399, 401), and one medial nerve branch block.  T529-531.   She was unable to get further radiofrequency nerve ablation because she was unable to lie down on the table due to severe pain.  T. 520-21.  All of these procedures were attempted as an alternative to spinal fusion. T. 371, 373-74. Significantly, as of August 2010, the complaints and diagnoses regarding the pain-producing medical conditions conceded by the ALJ remained virtually unchanged from two years before.  The medical evidence does not support the ALJ's credibility finding.

---

[17]"Intractable," in the medical sense, connotes "resistant to cure, relief, or control." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 953 (32d Ed.).  To risk stating the obvious, the doctor's use of this term must overcome the ALJ's conclusion that the pain was amenable to medication.

The ALJ also suggested that plaintiff's reported activities of living are not consistent with her complaints of pain: "The claimant testified she could do a number of household chores. She also testified she drives her son to school and attends his baseball games." T. 20. Again, this type of shorthand is not thoroughly descriptive of what plaintiff actually said. She did not deny all ability to work around the house. She generally needed her daughter with her when cooking. She could do laundry as long as someone brought her the clothes. When her back pain abated, she could move the laundry from the washer to the dryer. She was quite limited in her cleaning chores. Plaintiff did try to attend her son's games, but missed more than half of the games over the past two years. Plaintiff's daughter stepped in to aid the son with homework. None of this impeaches the medical evidence and the complaints of pain. Significantly, the ALJ's order, although facially acknowledging the severe medical conditions, does battle with virtually all of the complaints set out as relating to those conditions. This is not a case in which a claimant is saying simply that her pain prevents her from doing enumerated activities within the sedentary RFC. Instead, she is arguing that her conditions, primarily the migraines, the cervical spine, and the lumbar spine, cause her serious problems at intervals and intensities that can neither be predicted nor controlled in advance. As she so candidly said at the hearing, she could not be a "reliable" employee. Again, even the vocational expert called by the ALJ expressed amazement that the plaintiff kept her job at Sallie Mae as long as she did given her record of absences. The ALJ erred in the credibility ruling.

For the reasons set forth above, the court finds that the ALJ's decision was not supported by substantial evidence and that the Commissioner's determination should be remanded for further proceedings consistent with the findings set forth herein.

It is  therefore respectfully RECOMMENDED:

1.   That the Commissioner's decision be REVERSED and the matter REMANDED for further proceedings consistent with this Report and Recommendation.

2.   That the district court reserve jurisdiction to award attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and refer this matter to the undersigned in the event the parties are unable to agree.

At Pensacola, Florida, this 28th day of August, 2013.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).